Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 4933 | **DATE** | 3/10/2003 |
| **CASE TITLE** | Evergreen Marine Corporation vs. Division Sales, Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   Enter Memorandum Opinion & Order. Evergreen Marine Corporation's motion to dismiss the complaint of the intervenor [64-1] is denied. Defendants Division Sales U.S. and Division Sales International's motion to dismiss the complaint of the intervenor [62-1] is granted on the grounds that the intervenor failed to plead fraud with particularity. Intervenor S&P Wholesale International, Inc. has twenty days from the issuance of this order to amend its complaint.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | MAR 1 2 2003 date docketed | | |
| X | Docketing to mail notices. | | | | 87 |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| MM courtroom deputy's initials | | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | | |



MAR 1 2 2003

| | | |
|---|---|---|
| EVERGREEN MARINE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 01 C 4933 |
| | ) | |
| v. | ) | |
| | ) | |
| DIVISION SALES, INC., et al. | ) | Judge Joan B. Gottschall |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

S&P Wholesale International, Inc. ("S&P") intervened in this action to enforce its purported trademark rights in the CORNERSTONE CREATIONS mark. S&P has filed a complaint against Division Sales, Inc. ("DSI"), Justen-Marks Manufacturing, Ltd., Addjoin Enterprises, Ltd., Sunburst Trading Company, Ltd., High Ridge Partners, Inc., Division Sales U.S., L.L.C. ("DS-U.S."), Division Sales International, L.L.C. ("DS-International") and Evergreen Marine Corporation ("Evergreen") alleging federal claims of trademark infringement under 15 U.S.C. § 1114 and unfair competition and false designation of origin under 15 U.S.C. § 1125(a), as well as a state law claim for deceptive trade practices under 815 ILCS 505/2 and 815 ILCS 510/2.[1] Defendants DS-U.S. and DS-International (the "DS Entities") have filed a joint motion to dismiss the complaint of the intervenor ("Intervenor Complaint" or "IC") pursuant to Fed. R. Civ. P. 12(b)(6). Evergreen, the plaintiff in the underlying action, also filed a motion to dismiss the Intervenor Complaint, adopting certain arguments raised by DS-U.S. and DS-International. For the reasons stated below, Evergreen's motion to dismiss is denied but the

---

[1] The court notes that although the complaint also names Justen-Marks & Addjoin, both of those parties were dismissed with prejudice from the case by the court's order of 1/23/02, before S&P's motion to intervene was granted.

DS Entities' motion to dismiss is granted.

**Background**

S&P is in the business of importing and distributing certain retail items, such as crafts, candles and gift wrapping materials. According to S&P, starting in 1997 it used the trademark CORNERSTONE CREATIONS (the "Trademark") to identify its goods. S&P subsequently registered the Trademark with the United States Patent & Trademark Office; the registration was issued on November 30, 1999 and remains in full force and effect. On March 22, 2000, S&P and DSI entered an agreement under which S&P assigned its rights in the Trademark to DSI (the "Assignment Agreement"). Just over a year later, in April 2001, S&P sued DSI in Texas state court for breach of contract and fraud (the "Texas litigation") seeking rescission of the Assignment Agreement (as well as other contracts unrelated to this action).

On July 12, 2001, while the Texas litigation was pending, DSI "entered into a trust agreement and assignment for the benefit of creditors with Michael J. Eber of High Ridge Partners, Inc. [('High Ridge')], in which all of the assets of [DSI], including the Trademark, were placed in a trust known as the 'Division Sales Trust Agreement,' of which Michael Eber was trustee." (IC at ¶ 19.) Less than a week later, on July 19, 2001, S&P's attorneys gave High Ridge and its attorneys written notice regarding the Texas litigation and S&P's claims against DSI. On July 24, 2001, the trustee auctioned off DSI's assets, including the Assignment Agreement. DS-U.S. and/or DS-International purchased the Assignment Agreement, which the trustee sold with no warranties as to title.

On August 10, 2001, the Texas state court entered a default judgment against DSI, finding in relevant part that DSI fraudulently induced S&P to enter the Assignment Agreement

2

and made "a material misrepresentation and/or a promise to perform under [the Assignment Agreement] with no intention to perform . . . ." *Dancer v. Division Sales, Inc.*, Case No. 2001-17690, slip op. at 1-2 (Tex. Dist. Ct. Aug. 10, 2001). The Texas state court therefore ordered that the Assignment Agreement was rescinded and void.

Although the trustee's auction took place in July, the assets were not conveyed to the purchasers until late September—after the default judgment was entered in the Texas litigation and after S&P's attorneys notified DSI and its trustee, Eber, of that final judgment. Thus S&P claims that the trustee's conveyance of the Trademark to the DS Entities "was void and of no effect" because the Assignment Agreement had already been rescinded by the default judgment.

Although S&P contends that it is the sole owner of the Trademark, DS-U.S. has taken the position that it owns the Trademark, that the default judgment has no legal effect on the ownership of the trademark registration, and that it has the right to sell products bearing the Trademark. Accordingly, S&P filed the Intervenor Complaint seeking a declaration that it is the sole owner of the Trademark and the related trademark registration and that the assignment of the Trademark to DS-U.S. and/or D.S.-International is (and always was) of no force and effect. S&P also seeks a permanent injunction to prevent any of the parties from selling or distributing goods bearing the Trademark, as well as compensatory damages and disgorgement of profits.

## Analysis

According to S&P, resolution of its claims for trademark infringement, unfair competition and deceptive trade practices will require the court to determine who has the legal right to the Trademark, S&P or the DS Entities. The DS Entities, on the other hand, argue that there is no issue for resolution: they (joined in part by Evergreen) moved to dismiss the

3

Intervenor Complaint, contending that the Assignment Agreement they agreed to purchase from the trustee before the default judgment was entered gives them the legal right to sell goods bearing the Trademark. In other words, the DS Entities contend that the court can determine, as a matter of law, that they own the Trademark and its federal registration and, therefore, that S&P fails to state a claim for trademark infringement, unfair competition or deceptive trade practices because S&P has no legal right to the Trademark. In support of their motion to dismiss, the DS Entities argue that (1) DSI's assignment for the benefit of creditors effectively bars S&P from asserting rights in the Assignment Agreement (and Trademark); and (2) the default judgment issued by the Texas state court is not binding against the DS Entities because they are neither successors in interest to DSI nor in privity with DSI.[2] The court addresses these arguments in turn.

Despite the DS Entities' argument to the contrary, at this stage of the proceedings the court cannot determine that S&P's claims are barred as a matter of law simply because DSI assigned its assets for the benefit of creditors. An assignment for the benefit of creditors is one option for an insolvent company to liquidate its assets—it is a "voluntary transfer by a debtor of [its] property to an assignee in trust for the purpose of applying the property or proceeds thereof to the payment of [its] debts." 6 Am. Jur. 2d, Assignments for Benefit of Creditors, § 1 (1999). An assignee receives only the rights the assignor possessed—nothing more. *Marvel of Illinois, Inc. v. Marvel Contaminant Control Indus., Inc.*, 744 N.E.2d 312, 320 (Ill. App. Ct. 2001); 6 Am. Jur. 2d, Assignments for Benefit of Creditors, § 73. Further, an assignee accepts the assigned assets subject "to every defect of title to which [the property] was subject in the hands of the

---

[2]In its motion to dismiss, Evergreen adopted the first argument but not the second.

4

assignor...." 6 Am. Jur. 2d., Assignment for Benefit of Creditors, § 80. As a result,

> [i]n the case of property obtained by the assignor by fraud, the assignee stands in the shoes of the assignor, so if the transaction could be avoided as against the assignor, it can be avoided as against the assignee. An assignee of a fraudulent buyer succeeds only to the rights and interest of the buyer and is not entitled to hold the goods as against the defrauded seller.

*Id.* at § 81 (footnotes omitted).

Accepting S&P's allegations as true as the court must, *Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002), at the time DSI assigned its assets (including the Assignment Agreement) to the trustee, the Assignment Agreement was the subject of litigation but was still in effect. But the default judgment was entered—and the trustee received notice that the default judgment had been entered—before the sale of the Assignment Agreement to the DS Entities closed. Because the default judgment rescinded the Assignment Agreement on the grounds that DSI had fraudulently induced S&P's owners to enter that agreement, that judgment voided the Assignment Agreement against both DSI and its assignee, the trustee.[3] *See id.* Accordingly, S&P has a viable argument that the trustee had no legal rights

---

[3]Relying heavily on *Consolidated Pipe & Supply Co., Inc. v. Rovanco Corp.*, 897 F. Supp. 364 (N.D. Ill. 1995), the DS Entities argue that S&P's claims are barred and that it is improperly trying to reach property that DSI validly assigned for the benefit of creditors. The plaintiff in *Consolidated Pipe* obtained a default judgment against the assignor-debtor, then attempted to collect the judgment from the assignee. *Id.* at 369. The collection effort failed because "[o]nce a valid assignment for the benefit of creditors has been made, a judgment creditor of the assignor-debtor cannot reach property of the assignor-debtor now held by the assignee" to satisfy a judgment. *Id.* at 370. Under *Consolidated Pipe*, it is clear that S&P cannot attempt to collect the $2.1 million default judgment from the trustee. But S&P is not trying to collect on the judgment, and the case at bar goes beyond the facts presented in *Consolidated Pipe*. *Consolidated Pipe* did not involve property obtained by the assignor's fraud. Although the DS Entities do not find that distinction relevant, the court does.

As explained above, the trustee took the Assignment Agreement subject to any defects of title. The DS Entities repeatedly state that the default judgment was entered after the assignment, and contend that fact is dispositive—but their argument ignores that the sale did not close until

in the Assignment Agreement at the time the sale closed, and therefore had no right to complete the sale to the DS Entities. Given these allegations, the legality of the trustee's sale of the Assignment Agreement to the DS Entities is clearly in dispute.

Nevertheless, even if the trustee had no rights in the Assignment Agreement at the time the sale closed and thus had no right to proceed with the sale, the DS Entities still may have obtained legal rights to the Trademark. The critical question for the DS Entities is whether they were bona fide purchasers of the Trademark. If they were bona fide purchasers without notice (actual or constructive) that the trustee lacked rights in the Trademark, the DS Entities would be the lawful owners of the Trademark. *See, e.g., Koretz v. Heffernan*, No. 92 C 5419, 1993 WL 524438, * 7 (N.D. Ill. Dec. 13, 1993) (recognizing that bona fide purchasers' rights in trademark are superior to original owners); *Arena Auto Auction v. Schmerler Ford, Inc.*, 377 N.E. 2d 43, 45 (Ill. App. Ct. 1978) ("title of the innocent third party . . . is paramount to the true owner's"). "Notice after the agreement for the purchase is made, but before any payment, will destroy the character of bona fide purchaser," however. *Daniels v. Anderson*, 624 N.E.2d 1151, 1159 (Ill. App. Ct. 1993) (quoting 3 Pomeroy's Equity Jurisprudence, § 750 (5th ed. 1941) (italics omitted)). Thus the merit of S&P's claims against the DS Entities ultimately will depend on whether the DS Entities were bona fide purchasers or whether they received notice prior to

---

after the judgment was entered and the trustee received notice of the rescission of the Assignment Agreement. If the DS Entities were correct, a trustee could sell any assets that were assigned to him even if the trustee knew that the assignor-debtor had no legal right to some of those assets. That is not the law. If an assignor-debtor fraudulently obtains property, a trustee cannot withhold that property from its defrauded owner. 6 Am. Jur. 2d, Assignments for Benefit of Creditors, § 81. Because the Assignment Agreement was voidable against DSI and its trustee, and indeed was voided before the sale closed, the court finds the DS Entities' reliance on *Consolidated Pipe* unpersuasive.

closing on their purchase of the Assignment Agreement that the Agreement had been rescinded. S&P has not alleged that the DS Entities fail to qualify as bona fide purchasers, but no such allegations are necessary. 77 Am. Jur. 2d, Vendor & Purchaser, § 518 (2003). "The right to protection as a bona fide purchaser is regarded as an affirmative defense . . .," so the DS Entities must raise the defense and bear the burden of proof. *Id.*; *see also Oscar Gruss & Son v. First State Bank*, 582 F.2d 424, 433 n.12 (7th Cir. 1978). Accordingly, with respect to the DS Entities' first argument, there is no basis for dismissal of the Intervenor Complaint.

The DS Entities also argue for dismissal on the grounds that the default judgment does not preclude them from using the Trademark because that judgment does not bind them under principles of either claim preclusion (res judicata) or issue preclusion (collateral estoppel). As explained above, the critical question for the DS Entities is whether they qualify as bona fide purchasers. If they do, whatever rights S&P may have in the Trademark *vis a vis* DSI and its trustee, as documented by the default judgment, are of no consequence because a bona fide purchaser's rights are superior. *See, e.g., Koretz*, 1993 WL 524438 at *7. That said, the bona fide purchaser defense does not come into play unless S&P establishes that it has rights to the Trademark. The issue therefore is whether S&P can establish its rights to the Trademark through the default judgment, or whether S&P must allege (and litigate) the basis of its purported rights. The DS Entities argue that S&P cannot simply rely on the default judgment and further contend that because S&P's purported rights are premised on DSI's fraudulent conduct, S&P must allege that fraud with particularity but have failed to do so as required by Fed. R. Civ. P. 9(b). The court agrees.

To comply with the full-faith-and-credit requirements of 28 U.S.C. § 1738, this court

7

must give the default judgment the same preclusive effect that a Texas state court would give it. *4901 Corp. v. Town of Cicero*, 220 F.3d 522, 529 (7th Cir. 2000). As a threshold matter, the court notes that the issue presented here is not claim preclusion, but rather the offensive use of issue preclusion. *See Fletcher v. Nat'l Bank of Commerce*, 825 S.W.2d 176, 177 (Tex. App. 1992). Issue preclusion bars the relitigation of factual or legal issues that "were actually litigated and essential to the judgment in a prior suit." *Texas Capital Secs. Mgmt., Inc. v. Sandefer*, 80 S.W. 3d 260, 264 (Tex. App. 2002). Under Texas law, a party is subject to issue preclusion only if it was a party to the prior litigation or is in privity with a party to the prior litigation. *Mower v. Boyer*, 811 S.W.2d 560, 563 (Tex. 1991). The DSI Entities were not parties to the Texas litigation, so the question is whether they are in privity with DSI.[4] "Privity connotes those who are in law so connected with a party to the judgment as to have such an identity of interest that the party to the judgment [can be said to have] represented the same legal right." *Benson v. Wanda Petroleum Co.*, 468 S.W.2d 361, 363 (Tex. 1971). Determining whether a party is in privity with another requires close analysis of the circumstances of a particular case. *Id.* The mere fact that parties have an interest in proving the same facts does not establish privity. *Id.* Privity extends to successors in interest, those who were not a party but controlled the earlier litigation, and those whose interests were represented by a party to the earlier litigation. *Id.* The party that seeks to invoke issue preclusion—here, S&P—bears the burden of proving that issue preclusion is warranted. *See Texas Capital Secs.*, 80 S.W.2d at 264.

---

[4] If they were in privity with DSI, issue preclusion applies provided that "(1) the facts sought to be litigated in the [present] action were fully and fairly litigated in the [first] action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action." *Mower*, 811 S.W.2d at 563 (internal quotation marks and citation omitted).

8

The DS Entities argue that S&P has not pled, and will not be able to prove, that the DS Entities are successors in interest to DSI or that DSI adequately represented their interests in the Texas litigation.[5] S&P does not address the latter argument, but counters that the DS Entities are successors in interest "because they purchased the very trademark that was the subject of the Texas case." (Intervenor's Resp. Mot. Dismiss at 9). Neither party cites any Texas caselaw relating to these arguments.

The court concludes that based on the circumstances of this case, as alleged in the Intervenor Complaint, S&P has not provided a basis for issue preclusion.[6] The mere fact that the DS Entities purchased the Trademark at issue in the Texas litigation is not enough to deem them a successor in interest. For one thing, the DS Entities purchased the Assignment Agreement from the trustee at an auction, not from DSI. Several cases cited by the DS Entities suggest that "[t]here is no privity between two companies when one purchases the assets of another through an independent third party." *Rockwell Graphic Sys,. Inc. v DEV Indus., Inc.*, Nos. 84 C 6746 and 92 C 5679, 1994 WL 722027, *5 (N.D. Ill. Dec. 29, 1994), *vacated on other grounds*, 91 F.3d 914 (7th Cir. 1996); *Gammon, Inc. v. Lemelson*, 442 F. Supp. 211, 214 (D.N.J. 1977). Although there are certain factual distinctions between those cases and the case at bar, S&P is unable to cite a single case in which a court found that privity existed between two parties where the second party purchased the first party's assets from a third party.

---

[5] The allegations do not suggest, nor does S&P argue, that the DS Entities controlled the Texas litigation.

[6] In its brief in response to the motion to dismiss, S&P stated that certain individuals involved with the DS Entities had been involved with DSI. The court cannot consider this fact or draw any inferences from it because S&P did not raise it in the Intervenor Complaint.

9

More importantly, a finding of privity must comport with the fundamental fairness requirements of due process. 47 Am. Jur. 2d, Judgments, § 663 (1995). "A party will not be bound if its [purported] representative 'fail[s] to prosecute or defend the action with due diligence and reasonable prudence and the opposing party was on notice of facts making that failure apparent.'" *Diversified Fin. Sys., Inc. v. Boyd*, 678 N.E.2d 308, 313 (Ill. App. Ct. 1997) (quoting Restatement (Second) of Judgments § 75(2), at 209 (1982)). And there is no privity unless DSI's incentives to litigate were substantially the same as those of the DS Entities. *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 346 (2d Cir. 1995). Here, given the default judgment, it is clear that DSI failed to defend the Texas litigation. It is also clear that S&P knew that DSI had assigned its assets for the benefit of creditors before the default judgment was entered. S&P therefore had notice that DSI lacked an incentive to litigate the Texas action. Further, it is evident that DSI's incentive to litigate was quite different from the DS Entities' incentive. Unlike the DS Entities, who have a significant incentive to protect their rights to use the Trademark, DSI had no such incentive after it assigned its assets to the trustee to liquidate. Once DSI assigned its assets for the benefit of creditors, it no longer had any interest in the Assignment Agreement and thus, having no incentive to defend itself in the Texas litigation, DSI allowed the default judgment to be entered.

For these reasons, it would be fundamentally unfair for the DS Entities to be bound by the default judgment. Accordingly, S&P must establish the basis of its purported rights in the Trademark without relying on the default judgment. Because those rights are premised on DSI's fraudulent conduct, S&P must allege that fraud with particularity as required by Fed. R. Civ. P. 9(b), which it has not done. The court therefore grants the DS Entities' motion to dismiss on the

10

grounds that S&P has failed to plead fraud with particularity; S&P has twenty days from the issuance of this order to amend the Intervenor Complaint to correct this flaw.

**Conclusion**

For the reasons explained above, the DS Entities' motion to dismiss the Intervenor Complaint is granted. Evergreen's motion to dismiss the Intervenor Complaint, which did not incorporate the issue preclusion argument, is denied.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATE: March 10, 2003